EQUITABLE TRUST CO. OF NEW YORK v. NATIONAL BANK OF COMMERCE IN ST. LOUIS.

(District Court, E. D. Missouri, E. D. January 12, 1914.)

No. 4094

1. CORPORATIONS (§ 155*)—STOCK—DIVIDENDS—RIGHT TO.

Defendant national bank, through an agent who acted altogether in its interest and as its representative, entered into a contract by which the agent became a joint purchaser with others of substantially all of the common stock of a manufacturing corporation. The contract provided that the agent as trustee should hold the stock until fully paid for by the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

individual purchasers, with power to pledge the same as security for money borrowed to complete the purchase, the loans to be obtained on notes of one of the other purchasers, who also agreed to furnish additional collateral, the notes to be subject to renewals if desired for two years. It also provided that the trustee should collect all dividends which might be declared and paid on the stock "not disposed of under contract or contracts of pledge," and apply the same to the payment of the notes for borrowed money in his discretion. He borrowed from complainant trust company, on the recommendation of defendant, with which it had business relations, $250,000, and pledged as security therefor stock worth the same amount at par value, and also other collateral furnished by the maker of the notes. After about a year the manufacturing company declared and paid a dividend of 25 per cent., which was collected by the trustee, but no part of it was paid to complainant which was not advised of it or of the contract. Before the end of another year defendant through its said agent, induced complainant to exchange the pledged stock for other collateral, and shortly afterward another dividend of 50 per cent. was declared and paid on the stock. Defendant afterward sold the pledged stock. The collateral received by complainant in exchange was insufficient to pay its note. *Held*, that the dividends received by defendant on the pledged stock in equity belonged to complainant, which was entitled to recover the same or so much as was required to satisfy its claim.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 560–563, 568–576, 578, 593–603; Dec. Dig. § 155.*]

2. BANKS AND BANKING (§ 261*)—NATIONAL BANKS—LIABILITY FOR MONEY RECEIVED UNDER CONTRACT ULTRA VIRES.

A national bank cannot receive money equitably belonging to another without accounting for the same, even though it was received as an incident of a contract made by the bank, which was ultra vires and not enforceable.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 991–1000; Dec. Dig. § 261.*]

In Equity. Suit by the Equitable Trust Company of New York against the National Bank of Commerce in St. Louis. Decree for complainant.

Murray, Prentice & Howland, of New York City, and Judson, Green & Henry, of St. Louis, Mo., for complainant.

George L. Edwards, Edward D'Arcy, and Henry S. Priest, all of St. Louis, Mo., for defendant.

DYER, District Judge. It would be useless and unprofitable to enter into a lengthy discussion of the different phases of the evidence contained in the voluminous transcript now before the court. Such portions as may be considered important as bearing upon the real and controlling question in the case will either be copied or briefly referred to.

The claims advanced by and the contentions of the complainant and defendant are so numerous that in a measure they become confusing, and if the court should undertake to pass upon all of them, the chances are the main question would be lost sight of, or be at least greatly obscured.

The complainant in its bill seeks to recover of the defendant the sum of $150,000, with interest thereon at the rate of 6 per cent. per annum from the 1st day of July, 1911. The legal basis of the claim is that

the defendant has received certain moneys belonging to the complainant, which in equity and good conscience should be paid to it. This claim is stoutly denied by the defendant. The issue is sharply drawn, and its consideration and determination should not be clouded by other and less important questions, now vigorously urged upon the attention of the court by able and distinguished counsel. If the complainant's claim is not well founded, the bill should be dismissed. If, upon the contrary, it is well founded, there should be no delay in granting the relief prayed for in the bill. ·

[1] The facts—the important facts—as the court understands them are substantially these:

Some years prior to the autumn and winter of 1906, there was duly incorporated under the laws of the state of West Virginia the Iola Portland Cement Company. By its charter the company had a preferred capital stock of $1,500,000, divided into 60,000 shares of the par value of $25 each, and a common capital stock of $3,000,000, divided into 120,000 shares of $25 each.

The charter provided that the holders of the preferred stock should not be entitled to vote, but that they should be preferred as to dividends limited to 7 per cent. per annum, and preferred as to the principal of their stock and arrears of dividends upon dissolution.

The company was in the years 1906 and 1907, and for years prior and subsequent, engaged in the manufacture of Portland cement at Iola in the state of Kansas. In the latter part of 1906 and the early part of 1907 its stock, especially the common stock, was valuable and desirable.

At or near the same place in Kansas another plant, known as the Kansas Portland Cement Company was also engaged in the manufacture of cement.

At the head of this latter named plant was one George E. Nicholson. His attention was attracted to the Iola plant, and he concluded that the ownership of the Iola stock was very desirable. He thereupon, to wit, in the latter part of the year 1906, set about to get an option upon the stock, and thereafter avail himself of the option and buy the stock.

. The evidence of Nicholson was taken at the hearing, and it throws much light upon the manner and means employed by him in obtaining the option, and the sources from which he obtained the money to pay for the stock. So much of his testimony as seems pertinent is as follows:

"Q. State when and how you became interested in the Iola Portland Cement Company. A. Well, how I became interested, or rather when, was in December of 1906 and January of 1907. How I became interested was largely through my knowledge of the business in the plant we had and the trouble that had occurred from time to time between the Iola Company and the company I represented or was president and general manager of. Q. What was the name of that company? A. The Kansas Portland Cement Company. Our going into the field created a good deal of feeling on their part, and notwithstanding, as I said a moment ago, we paid as high as $2 a barrel for our cement, when we got ready to put our product on the market we sold as low as 80 cents through an action on their part that we looked upon as trying to force us out of the business. We were the second plant in the

West, and they were the first—in saying 'West' I mean Middle West. There was more or less contention from time to time, and when it finally developed that there was a representative over there looking the Iola property over, we naturally proceeded to try to ascertain who he represented. It so happened that he had been a professor in chemistry, a gentleman who was out there in Ann Arbor, and my chief superintendent, Mr. E. C. Champion, had taken chemistry of him, and through that connection we began to investigate. I sent a gentleman from New York, and in due time got in touch with the principals involved in the purchasing of the Iola plant, which at that time consisted of Holmes & Brown of New York, I think I may say—they formerly lived in Detroit—and H. G. Hamilton, of Youngstown, Ohio. In due time I was brought in touch with the principals, first, I think, in New York, and afterwards in Cleveland and later in St. Louis, and after negotiations covering some weeks, the deal was consummated.

"Q. Mr. Nicholson, please state what was the plan after the negotiations that you have referred to, under which you sought to acquire a large part of the common capital stock of the Iola Portland Cement Company. In other words, did you undertake to accomplish that under the terms of an option that was held by H. G. Hamilton, of Youngstown, Ohio? A. Yes, we found —in answer to your question I will say, we found Mr. Hamilton and Holmes and Brown had an option on the property to acquire the common capital stock of the company, consisting of 120,000 shares of a par value of $3,000,000. Q. State briefly what that option was, Mr. Nicholson. A. I think the option was between Mr. Bassett as president of the company and some other members of his executive committee, for the acquiring of the common capital stock of the company at the value of $25 per share. There was an agreement on the part of the holders of the option to take all of the common stock offered at that price, with a guaranty on the part of the sellers to deliver not less than 51 per cent. It further carried with it an obligation on the part of the purchasers to take all the preferred stock of the company, consisting of $1,500,000, that might be offered in connection with the sale of the common stock. That preferred stock was to be taken at retirement price, that is, par and 10 per cent., so that it made a share of $25 cost the purchaser $27.50. Q. That is of the preferred? A. That is of the preferred. Q. What was finally done under that option, Mr. Nicholson, after you became interested in it? A. Well, after considerable negotiations back and forth, when I felt that I had the proposition pretty well in hand, I came on to St. Louis with a view of financing it.

"Q. Let me interrupt you just a moment: Did you, before coming to St. Louis—before we take up the financing of the purchase of that stock under that option—did you make any arrangements for having the rights of the holders of that option to buy the stock as you have outlined, transferred or assigned to you? A. Yes; I had an agreement to that effect. Q. You had an agreement with them to that effect? A. Yes, sir. Q. State what you did looking towards acquiring the stock under that option. A. My next step of necessity was to finance it. I had my own funds pretty well invested in propositions I was interested in, plants not only in the Kansas belt, but one in Tennessee, near Chattanooga, and the other up at Des Moines, Iowa. I think I came to St. Louis first right after Christmas of 1906. The first conference I had with Mr. Van Blarcom, then president of the National Bank of Commerce. I presented the proposition to him in all its details, and gave him the showing of what the company was doing in which I was interested at the time, the Kansas Portland Cement Company, and stated in general the cement situation here in the Middle West, and our reasons for wanting to acquire the plant. I stated to him about the amount it would take, in my judgment, to purchase the property, that I thought the common stock would come in pretty freely, and in all possibility a good proportion of the preferred stock. After considerable negotiations (I don't recall just how long it lasted, but I was in to see him several times) it finally resulted in this kind of an arrangement: Mr. Van Blarcom stated he would be willing to finance one-half the requirements, or approximately, $1,500,000 of the common stock, but that he would not become interested in the purchase of the preferred. He further stated that he would lend me the assistance of the

bank, and assist in every way they could on the outside in procuring the additional money to finance the purchase of the Iola Company. As near as I can recall, practically all my conferences were with Mr. Van Blarcom. I recall a little chat with Mr. Edwards, Mr. B. F. Edwards, then cashier, I think, of the bank, but Mr. Edwards never warmed up to the proposition, and the negotiations were practically all between Mr. Van Blarcom and myself; and later on Mr. Perry was called in to investigate, I presume,. certain statements I had made, and later journeyed with me to different places for the purpose of raising these funds to complete the purchase of the Iola Company.

"Q. What amount of money for the purpose of acquiring this common capital stock of the Iola Company did you raise yourself, independently of the National Bank of Commerce or of any assistance which any of the officers of that bank gave you? A. I think my first negotiations were with the president of the Commerce in Kansas City, Dr. Woods. I got $100,000 from him and $100,000 from the Commerce Trust Company, in which the doctor was also interested, and W. T. Kemper, I think, was vice president or president, whom I was acquainted 'with, and I think I secured $50,000—I am sure I did—from Mr. Holmes of the Pioneer Trust Company, and a short time after that I secured $500,000 from a personal friend, William Lanyon, whom I met in Iola after selling his smelting property to some New York people. Mr. Lanyon is now in St. Louis. I have been acquainted with Mr. Lanyon ever since 1879, and constructed many smelting plants and furnaces for him. Q. Then you acquired unaided, $750,000, if I followed you correctly? A. How much? Q. $750,000? A. Yes, sir.

"Q. Who were interested with you, and how, Mr. Nicholson in the acquirement of this common capital stock of the Iola Portland Cement Company? What was the plan finally worked out for that purpose? A. The plan as finally worked out resulted in an agreement being drawn between three parties, H. G. Hamilton, of Youngstown, Ohio— Q. Whom did he represent? A. Well, I should say, himself and Mr. John Sherwin, president of the First National Bank of Cleveland. Q. Did he also represent Mr. F. H. Goff of the Cleveland Trust Company? A. I rather thought he did, but we never knew whether Mr. Goff was really interested as a party to the trade, or simply as counsel for Mr. Hamilton and Mr. Sherwin. Q. Go on. A. The next party was Mr. Perry, representing the National Bank of Commerce, and their associates there, and myself. The agreement was along the lines— Q. You have seen this agreement dated January 17, 1907, that was finally entered into between you and Mr. Perry, providing for those three interests; you have seen that frequently, have you not? A. Yes, sir. Q. Did that cover the plan that you referred to, which was subsequently reduced to writing? A. Yes, sir."

The agreement between Perry, representing the defendant bank, and Nicholson was subsequently reduced to writing, and dated the 17th of January, 1907. It is as follows:

"This contract and agreement, made and entered into this 17th day of January, 1907, by and between George E. Nicholson, of Iola, Kansas, and J. W. Perry, of St. Louis, Missouri, Witnesseth:

"That said parties have and do hereby associate themselves together for the purpose of purchasing, acquiring and owning all or such part as they may be able to purchase or acquire of the common capital stock of the Iola Portland Cement Company, a corporation organized under the laws of West Virginia, and having a common capital stock of three millions of dollars ($3,000,000) divided into 120,000 shares of the par value of twenty-five dollars ($25.00) each, upon the following understanding and agreement with each other, that is to say:

"(a) That J. W. Perry shall purchase all of the shares of the common capital stock of said company on deposit with the German Savings Bank of Davenport, Iowa, on the 17th day of January, 1907, with power to said bank or another, to sell and transfer, and all which may thereafter be deposited with said bank before April 1st, 1907, with power to said bank or another,

to sell and transfer, or which said J. W. Perry may be able to acquire from any shareholder, prior to April 1st, 1907, all at the price of twenty-five dollars ($25.00) per share.

"(b) George E. Nicholson hereby agrees, upon demand, to pay to J. W. Perry all sums of money expended by him in the purchase of the common capital stock of said company, and all expenses incurred by him incident thereto.

"(c) J. W. Perry hereby agrees and promises to use his best efforts and endeavors to procure and negotiate for George E. Nicholson the loan of such money as may be necessary to enable the latter to pay for said stock, and renewals thereof, if necessary to February 1st, 1909.

"(d) To enable J. W. Perry to procure the necessary loan of money to pay for said stock, George E. Nicholson agrees to execute or have others execute for him, in blank, his collateral promissory notes and contracts of pledge in such number and form, and conditioned and provisioned as said J. W. Perry, or B. F. Edwards, or the president or cashier of the National Bank of Commerce in St. Louis (all of which said parties are hereinafter referred to as 'said parties or either of them') may require, and to deliver the same to the National Bank of Commerce in St. Louis; and hereby authorizes said parties or either of them to fill up said notes and contracts of pledge in such way, and in such amounts, payable at such time and to such parties, and bearing such rate of interest as said parties or either of them may elect, and does hereby authorize said parties or either of them upon filling up said notes and contracts of pledge, to deliver the same to such party or parties as said parties or either of them may elect, for the purpose of obtaining said loan or loans of money.  Said parties or either of them shall have the power, upon maturity of any such notes, to fill up and deliver renewal notes and contracts of pledge therefor, if they so elect, and for that purpose the said George E. Nicholson shall execute or have others execute for him, and deliver to said bank, in like manner as above provided, his collateral notes, and contracts of pledge.

"For the purpose of further enabling said J. W. Perry to procure said loan of money, and of securing the payment of said notes, said George E. Nicholson further agrees to deliver to the National Bank of Commerce in St. Louis, at least the sum of two million dollars par value of collateral, and maintain in value the same from time to time, to be satisfactory to said parties or either of them, and shall, in addition thereto, procure such of said notes and contracts of pledge as said parties or either of them may require to be signed by other party or parties, or maker or indorser, to the satisfaction of said parties or either of them.

"Said parties or either of them shall have the power to pledge said collateral or such part thereof for the payment of all or any of said notes, in such part and amount as in the judgment of said parties or either of them, they may deem best.

"(e) All of the common capital stock of said company so acquired or purchased by J. W. Perry shall be transferred upon the books of said company to his name, and he shall hold the same in trust until the full amount of all of the notes above provided for to be executed and delivered in procuring the necessary loan of moneys to pay the purchase price of said stock, shall have been fully paid, except as herein provided, and subject to the provisions of this contract, with the following powers and duties:

"1. During said period of time to vote said stock at all stockholders' meetings of said company, unless the same shall be disposed of pursuant to contract or contracts of pledge of said stock hereinafter authorized.

"2. To pledge or hypothecate the same or any part thereof, on such terms and conditions as he may approve, to secure the payment of any or all of said collateral notes as may be signed by George E. Nicholson or others for him, as above provided, for the purpose of obtaining the loan of money to pay the purchase price of said stock, or any note or renewal of said note or notes.

"3. Upon the full payment, by either J. W. Perry of St. Louis, H. G. Hamilton, of Youngstown, Ohio, or George E. Nicholson, of Iola, Kansas, of one-third of the purchase price of said stock, together with such interest thereon

as George E. Nicholson may have paid or become liable to pay, less such dividends as may be paid upon one-third part of said stock in the meantime, to deliver to the party making such payment or to such party as he may designate, one-third of the common capital stock of said company held in trust by him, and cause the same to be transferred to such party or such parties as he may designate on the books of said company; provided, said stock has not been sold or disposed of under contract or contracts of pledge hereinabove authorized, and further provided that any part of said one-third may be withdrawn on the same conditions pro rata.

"4. To collect and receive during said period of time all dividends that may be declared and paid on said stock not disposed of under contract or contracts of pledge, as hereinabove authorized and apply the same to the payment of the principal and interest on said notes, provided to be executed by George E. Nicholson or others for him, and filled up and delivered by said parties or either of them, as hereinabove provided, as in the judgment of the said parties or either of them may be deemed best; provided that if said J. W. Perry, H. G. Hamilton or George E. Nicholson shall elect to pay for and have transferred to him on the books of said company, as herein provided, one-third or any part thereof, of the common capital stock of said company, held in trust by said J. W. Perry, or such part thereof as may not have been disposed of under contract or contracts of pledge, as hereinabove authorized, he shall be entitled thereafter to receive all dividends paid on said stock.

"5. Upon the full payment from dividends paid on said stock of all notes, executed by George E. Nicholson or others for him, and filled up and negotiated by said parties or either of them for the purpose of obtaining loans as hereinabove provided, together with all interest on said notes, to deliver and cause to be transferred on the books of said company, one-third of the common capital stock of said company, so held by him as trustee at said time, and not disposed of under contract or contracts of pledge, as hereinabove authorized, to each said J. W. Perry, H. G. Hamilton and George E. Nicholson not electing to purchase the same prior thereto as herein provided, less such part to any party as he may have previously withdrawn hereunder.

"(f) Upon the full payment of all notes executed by George E. Nicholson or others for him, filled up and negotiated by said parties or either of them for the purpose of obtaining or securing loans, as hereinabove provided, together with interest thereon, according to their terms and to all other expenses incurred by J. W. Perry incident thereto, he shall cause to be delivered by the National Bank of Commerce in St. Louis, to George E. Nicholson, all collateral deposited by him with said bank for the purpose of securing the payment of said notes or any of them.

"(g) The National Bank of Commerce in St. Louis shall have the power at any time to remove as a party hereto and trustee herein, J. W. Perry, and substitute any other party in his stead, upon notice to that effect, in writing, delivered to Mr. George E. Nicholson; and in the event of the death of said J. W. Perry, to appoint a party to succeed him as a party hereto and as trustee herein. In either of said events, said party so appointed by the National Bank of Commerce in lieu of said J. W. Perry, shall succeed to all of his rights and duties herein as a party to this agreement and as trustee herein. This provision shall not be construed to make the National Bank of Commerce in St. Louis liable in any respect whatever on account of any obligation or duty assumed by J. W. Perry, either as party or trustee under this contract.

"(h) J. W. Perry as trustee herein covenants faithfully to perform and fulfill the obligations and duties imposed upon him as trustee herein, not being liable or responsible for any mischance occasioned by others, but only for willful misconduct, or gross negligence on his own part as such trustee.

"In witness whereof, the parties hereto have hereunto subscribed their names on this 23d day of January, 1907.

"[Signed]    Geo. E. Nicholson.
"[Signed]    J. W. Perry.
"[Signed]    J. W. Perry, Trustee.

"This agreement supplemental to a certain contract and agreement made and entered into on the 17th day of January, 1907, by and between George E. Nicholson, of. Iola, Kansas, and J. W. Perry, of St. Louis, Missouri:

"Witnesseth: That the parties to said contract and agreement have and do hereby agree to extend the same indefinitely, to be terminated at any time at the option of said J. W. Perry.

"In witness whereof said parties have hereunto subscribed their names on this ——— day of December, 1908.

"[Signed]    Geo. E. Nicholson.<br>"[Signed]    J. W. Perry."

A fair analysis of the verbal contract subsequently embodied in the written one above quoted is as follows:

"The purpose of the plan is to acquire the common stock of the Iola Company.

"The bank is to acquire at its par value of $25 all the stock which can be had before April 1, 1907.

"Nicholson is to be liable to the bank for the purchase price of the stock and the expenses incident to its purchase.

"The bank is to endeavor to procure the loan of such money as may be necessary to pay for the stock and to obtain renewals of such loans up to February 1, 1909.

"In connection with the bank's raising of the money Nicholson is to execute in blank his collateral promissory notes and contracts of pledge in such number and form and so conditioned and provisioned as Perry or B. F. Edwards (then vice president of the bank), or the president or cashier of the bank may require, and deliver those notes to the bank. The bank is authorized to fill up these notes and contracts in respect of amounts, time, payees and interest rate as it may decide, and to use them for the purpose of obtaining loans; also to make renewal notes and contracts on Nicholson's blank obligations. Nicholson also agrees as margin collateral to put up with the bank all the collateral in his possession or under his control, amounting to $2,000,000 par value, and to keep it good according to the bank's direction, and also to procure other signatures on his notes as it may direct. The bank is authorized to pledge all of the collateral according to' its own judgment.

"The stock purchased is to be transferred to the name of Perry (i. e. the bank), who is to hold it in trust until the notes have all been paid; he is to vote the stock until it shall have passed out of his name; he is to pledge it at his uncontrolled discretion for loans; upon full payment of one-third of it, either by the bank or by the Cleveland interests or by Nicholson, he is to deliver that one-third to the party making the payment, and likewise pro rata; he is to collect the dividends that may be declared and paid on the stock *not disposed of under contract or contracts of pledge*; and apply those dividends to the payment of Nicholson's notes in his uncontrolled discretion; upon the full payment of the loans out of the dividends he is to divide the stock into thirds among the bank, the Cleveland interest and Nicholson, and upon the full payment of the notes, however made, Nicholson's margin collateral is to be returned to him.

"The National Bank of Commerce in St. Louis is to have power at any time to remove Perry as a party to the agreement and as trustee, and substitute any one in his stead, upon notice in writing to Nicholson, and such appointee of the bank is to have all powers, rights and duties as a part of the agreement and as trustee."

It seems to have been understood by the parties to the agreement that the bank, as such, was without authority under the National Bank Act to make a binding contract of this character. For that reason (it seems to the court) Perry was selected to do indirectly for the bank what the bank itself could not, under the law, directly do. The court finds from the evidence in the case that Perry, at that time and at all times subsequent thereto, up to the time he severed his connection

with the defendant bank, was acting as its agent and solely in its interests. If any doubt existed as to the correctness of this opinion, it was settled by the declaration made by Perry on the 16th of April, 1907. That is as follows:

"Exhibit B.

"This declaration witnesseth: That the undersigned, J. W. Perry, who is a party to a certain contract made and entered into on the 17th day of January, 1907, by and between George E. Nicholson, of Iola, Kansas, and J. W. Perry, of St. Louis, Missouri, made and entered into the same on behalf of and for the use and benefit of the National Bank of Commerce in St. Louis, and that all rights, benefits and profits that may accrue to the undersigned under and by virtue of said contract belong to and shall inure to the use and benefit of the National Bank of Commerce in St. Louis, and all obligations that may rest upon the undersigned by virtue of said contract shall be met and discharged by the National Bank of Commerce in St. Louis.

"Witness my hand and seal on this 16th day of April, 1907.
"_____."

After Van Blarcom and Nicholson reached the agreement before and at length set forth, the bank through its president, Van Blarcom, set out to comply with its agreement made with Nicholson—

"to procure the loan of such money as may be necessary to pay for the stock and to obtain renewals of such loans up to February 1, 1909."

Perry went to New York and with him carried the following letter:

"The National Bank of Commerce in St. Louis.
                                    "St. Louis, Mo., January 12, 1907.
"J. C. Van Blarcom, President.
"Mr. W. H. Taylor, First Vice President,
        "Bowling Green Trust Company,
            "New York City.
"Dear Sir: This will introduce to you Mr. J. W. Perry, who is the representative of this bank, although not on the official staff. Mr. Perry is in New York in connection with a transaction which he will explain to you and you may rely upon any statement which he will make. We intend to take a large interest in the transaction ourselves and will advance the money on the same securities which he will offer to you. Further details will be explained by Mr. Perry. Thanking you for any courtesy extended to him, I am
        "Yours sincerely,          [Signed] J. C. Van Blarcom, President."

From all the testimony, facts, and circumstances shown in the evidence, the court finds that the Bowling Green Trust Company made the loan of $250,000 to Nicholson upon the representations made in that letter. Taylor, the vice president, had no acquaintance with Nicholson, and knew nothing of the value of the collateral offered, other than that given in the letter of Van Blarcom;

"We intend to take a large interest in the transaction ourselves and will advance the moneys on the same securities which he (Perry) will offer to you."

This was the representation made by the president of a bank with which the trust company had for a long time maintained friendly relations, and between which mutual accounts had been carried. The collateral offered to the Bowling Green Trust Company by Perry was ample and sufficient to secure the payment of $250,000. It was ac-

cepted by the trust company on the assurance that the Bank of Commerce was loaning money on the same character of collateral. The security was good, and if it had remained there, there never would have been any need of litigation between the Bowling Green Trust Company, or its successor, and the National Bank of Commerce. The note of Nicholson for $250,000, secured in part by 10,000 shares of the common stock of the Iola Company, was given to and accepted by the Trust Company. The proceeds of this note went in part to pay for 110,330 shares of the Iola common stock. So soon as this stock was bought, enough of the old directors of the Iola Company retired from the board to give the Bank of Commerce control of the business and finances of the company. This control was at all times subsequently maintained—officers and directors of the Bank of Commerce became officers and directors of the Iola Company, and the interlocking directorates of the two controlled in a large measure the cement business of the Iola Company and other companies.

The original note of the trust company ran for six months, and was renewed for that amount on the ——— day of July, 1907; and again renewed for the same amount January ——, 1908, the trust company retaining all of this time the same collateral (including the 10,000 shares of the Iola common stock) that had been originally pledged. Shortly after the second renewal, to wit, on the 6th of February, 1908, the Iola directors declared a dividend of 25 per cent. on the common stock, amounting in the aggregate to $750,000. The dividend on that part of the stock acquired by the bank under the agreement of January 17, 1907, amounted to $689,562.50. The dividend was paid on the 10th of March, 1907, to the Bank of Commerce. The proportionate share of this dividend on the 10,000 shares held by the Bowling Green Trust Company, amounted to $62,500, not a dollar of which reached the trust company, although it then held as collateral to its loan 10,000 shares of the stock upon which the dividend had been declared. Although it is stoutly contended by the defendant that the trust company, by letters and otherwise, was apprised of this dividend, the court finds as a matter of fact from all the evidence in the case that the trust company was not so apprised.

In December, 1908, Perry acting for the bank, induced the trust company to agree to an exchange of collateral. That is to say the trust company surrendered the common stock held by it to the Bank of Commerce for certain shares of the preferred stock held by it. Why was this exchange made and for what purpose and for whose benefit? At that time there was a very large amount of money in the treasury of the Iola Company, which could be distributed in dividends on the common stock. In a few days after the exchange had been effected the board of directors of the Iola Company (dominated and controlled by the defendant bank) declared a dividend of 50 per cent. on the common stock of the company, amounting to the sum of $1,-500,000. The proportionate share of the dividend on the 10,000 shares then recently in the hands of the Bowling Green Trust Company amounted to the sum of $125,000. This amount the defendant received and applied. It subsequently sold the 10,000 shares of stock

at something over $8 per share, aggregating $80,000, and received and applied that as it had the 50 per cent. dividend. The bank received the dividend of 25 per cent. declared in March, 1908, the 50 per cent. dividend declared in December, 1908, and the proceeds of the sale of the stock in 1909, making a grand total of $267,500—more than enough to have paid in full the loan made by the Bowling Green Trust Company. The court finds from the evidence in the case that the trust company knew nothing of these dividends until long after they were declared and paid. The court also finds from the evidence that the trust company was kept in absolute ignorance of the contract of January 17, 1907. It did not know, and had no reason to believe, that the bank had any further interest in the transaction than that of lender of money on the same kind of collateral that the trust company was induced to accept by the letter of Van Blarcom hereinbefore set out.

It appears that the complainant, the Equitable Trust Company of New York, took over the business and assets of the Bowling Green Trust Company, but the references made in this opinion to the "trust company" were intended to apply mainly to the Bowling Green Trust Company of New York. Upon a fair consideration of all the facts and circumstances given in evidence, it would, in the judgment of the court, be inequitable to withhold from the trust company the dividends declared upon, and the moneys received from the sale of the 10,000 shares of the common stock originally pledged to the Bowling Green Trust Company of New York.

[2] In reaching this conclusion the court has not been unmindful of the plea of ultra vires, so ably urged upon the court by the able counsel for defendant, and has no hesitancy in saying that the making of the contract of January 17, 1907, so far as the Bank of Commerce is concerned, was without authority of law, and a suit to enforce the same would be unavailing. That would be a very different proceeding from the one now before the court. The bank cannot receive moneys equitably belonging to another and not account for the same, even though they be received as an incident of the bank's illegal contract.

The court has tried to keep constantly in view what it has considered from the beginning the controlling question in the case, and has refrained from seeking or attempting to find legal technicalities as a basis or excuse for withholding from the complainant the equitable relief to which it seems to be so clearly entitled.

During the hearing various objections were made by the complainant and the defendant to the introduction of certain testimony. Many of those objections were not ruled upon at the time, but were taken under advisement to be later determined. To save to each party the benefit of each and every objection so made, the court now overrules the same and allows exceptions to the ruling.

It follows from what has been said that the complainant is entitled to the relief prayed for in its bill, and a judgment will be entered in accordance therewith.